Filed 8/15/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PONANI SUKUMAR, | D071527 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2015-00032528-CU-WM-CTL) |
| CITY OF SAN DIEGO, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, John S. Meyer, Judge.  Reversed and remanded with directions.

Friedhofer PC and James E. Friedhofer for Plaintiff and Appellant.

Mara W. Elliott, City Attorney, George F. Schaefer, Assistant City Attorney, and Catherine A. Richardson, Deputy City Attorney, for Defendant and Respondent.

Litigation under the Public Records Act (PRA) (Gov. Code,[1] § 6250 et seq.) is one of the rare instances where a losing party may still be deemed a prevailing party entitled to an attorney fee award.  This is because the plaintiff has prevailed within the meaning of the PRA when he or she files an action that "results in defendant releasing a

---

[1]     Undesignated statutory references are to the Government Code.

copy of a previously withheld document." (*Belth v. Garamendi* (1991) 232 Cal.App.3d 896, 898 (*Belth*).)

Thus, a plaintiff need not achieve a favorable final judgment to be a prevailing party in PRA litigation. A defendant's voluntary action in providing public records that is induced by plaintiff's lawsuit will still support an attorney fee award on the rationale that the lawsuit "'spurred defendant to act or was a catalyst speeding defendant's response.'" (*Belth, supra,* 232 Cal.App.3d at p. 901.)

In this PRA litigation, Ponani Sukumar appeals an order denying his motion for prevailing party attorney fees against the City of San Diego (City). We reverse because the undisputed evidence establishes the City produced, among other things, five photographs of Sukumar's property and 146 pages of e-mails directly as a result of court-ordered depositions in this litigation. We remand for the trial court to determine the amount of attorney fees to which Sukumar is entitled.

## FACTUAL AND PROCEDURAL BACKGROUND

As explained *post*, the primary issue is whether substantial evidence supports the trial court's finding that Sukumar's lawsuit did not cause the City to release requested public records. To resolve this issue, it is necessary to examine the parties' communications, the timing of the public record productions, and the nature of the records produced.

2

A. *Historical Background*

Sukumar owns a home in San Diego (the Property). In about 1992, Sukumar's neighbors began complaining to the City about Sukumar's use of the Property. These complaints mostly involved parking issues and noise.

In 2005 Sukumar's neighbors complained to the City that Sukumar was operating a business on the Property and had installed industrial equipment in the garage. The City's Neighborhood Code Compliance Department (NCC) began investigating.

In 2006 the City ordered Sukumar to take "immediate action to correct" municipal code violations occurring on the Property that constituted "a public nuisance." However, the City decided to not pursue the matter absent additional neighbor complaints.

In 2013 NCC again investigated neighborhood complaints about the Property. An NCC investigator inspected the Property, saw large fans mounted on the exterior wall and a new gas line. However, after determining these improvements had been City-inspected and approved, NCC closed the case in November 2013.

The hiatus did not last long. In September 2014 one of Sukumar's neighbors sent an e-mail to Sharren Carr, who works in City councilmember Sherri Lightner's office. This e-mail complained of numerous "code violations" at the Property, and included photographs of commercial washers and dryers, and a "large number of commercial refrigerator freezers and commercial kitchen preparation equipment installed in the three car garage." The e-mail also describes large fans operating five feet from the property line, apparently to disburse heat generated by these machines in the garage. The e-mail states these fans "generate[] the racket of high speed air blowing across the property line,

3

directly through my front door and windows facing the home, and disturbing the peace of all."

In December 2014 the City notified Sukumar he was "subject to civil penalties" for violating the municipal code by: (1) eliminating required off street parking by installing "six sets of washer and dryer units, five large refrigerators, a commercial grade sink, [and] two reverse osmosis water filtration systems" in the three-car garage; (2) cutting the concrete garage floor to connect drains without the required plumbing permit; (3) installing electrical circuits in the garage without the required permit; (4) causing excessive noise by fans and air conditioning units exceeding allowable decibel limits for a residential zone; (5) installing unpermitted outdoor lighting that illuminates adjacent properties without the required screening; and (6) erecting a 15-foot high fence.

In July 2015 Sukumar's neighbors continued complaining to the City about excessive noise caused by the heat-exhaust fans. One neighbor wrote, "When the fans are on, I cannot have the windows open, and we are still not able to use the living or dining rooms when the fans are on." He continued, "[A]ll of the commercial refrigerators, washer/dryer units, reverse osmosis and commercial kitchen equipment remain in all of the garage spaces, no cars can be parked in the garages and the commercial passenger busses [*sic*] continue to be parked in [Sukumar's] driveway."

B. *PRA Request*

On August 7, 2015, Sukumar's attorney delivered a request to the City for "production of documents and information" under the PRA. The request states the information requested "will be used to assist [] Sukumar, and his agents . . . [in]

4

addressing enforcement actions initiated and/or contemplated presently by the City" concerning the Property.

Sukumar's PRA request sought 54 separate categories of documents, including all documents related to or mentioning him from 1990 to August 7, 2015, as well as all such records related to or mentioning (1) the Property; (2) a business Sukumar operates called Holistic Vegetarian House Corporation; (3) five of Sukumar's associates, who are identified by name; (4) eight of Sukumar's neighbors, who are identified by name; and (5) City investigations of Sukumar, his associates, and the Property. The PRA request states "[t]ime is of the essence concerning this request" because Sukumar is "presently being subjected to inquiries and/or investigations and/or actions initiated" by the City's code enforcement division.

C. *City's Response*

Lea Fields-Bernard, a licensed California lawyer, is the City's public records administrator who handled Sukumar's PRA request. She determined which City departments might have responsive documents. Because Sukumar sought documents pertaining to the Property and code enforcement issues, on August 10, 2015, Fields-Bernard forwarded the request to the City's Code Enforcement, Development Services, Police, Fire-Rescue, Environmental Services and Risk Management departments. Fields-Bernard designated Development Services as the lead department responsible for providing a written response and coordinating production of responsive documents.

Virginia Rodriguez is the custodian of records for Development Services. Development Services maintains hundreds of thousands of documents. After receiving

5

Sukumar's request, Rodriguez looked in Development Services's "project tracking system" for files pertaining to Sukumar and the Property. She contacted NCC, which gave her its case file on the Property. This file included documents involving a case opened in December 2014 as well as a prior closed case. Rodriguez also received responsive documents from the police department. NCC's closed files were also searched, and Rodriquez determined no additional responsive documents existed.

On August 31, 2015 (24 days after the request), Rodriguez wrote to Sukumar's attorney, stating, "This letter constitutes the City's *final response* to your August 07, 2015 request for records . . . ." (Italics added.) The letter states some potentially responsive documents are exempt from disclosure, and responsive, nonexempt records would be made available for Sukumar's review.

D. *City's Production of Records, Up to Filing of Writ Petition*

The next day, September 1, 2015, Sukumar's attorney sent an e-mail to Rodriguez. He asked her to confirm the City's record search extended not only to the Property, but also to documents related to the names of individuals identified in the request. Counsel asked to schedule a time to review and copy responsive documents.

On September 2, 2015, Rodriguez replied, stating the City's search was "not limited strictly" to the Property and "City staff has searched *as broadly and as thoroughly as possible* to locate documents requested." (Italics added.) She assured Sukumar's lawyer, "*There are no records being withheld entirely*" (italics added), and only a portion of the documents were being redacted based upon claims of exemption. Rodriguez invited Sukumar's lawyer to view and copy documents at the City's records center during

6

business hours.  She also informed Sukumar's lawyer that because pre-2006 e-mails were archived on "old hard drives," the City would charge Sukumar $800 to $1,000 to search those hard drives for responsive e-mails.

Later that same day, Sukumar's lawyer asked Rodriguez to retrieve the pre-2006 e-mails at his expense.  He also asked for an estimate of the number of responsive records so he could "immediately authorize copying."

On September 4, 2015, Sukumar's attorneys met with Rodriguez; she produced 292 pages for inspection and copying.  There is a conflict in the evidence about whether Rodriguez told Sukumar's lawyers more documents might be produced at a later date.  In a lawyer-drafted declaration, Rodriguez states that during this meeting she told Sukumar's lawyers that more responsive documents might be produced later because the post-2007 e-mail search was then incomplete.  However, in deposition testimony, Rodriguez testified differently, stating:

> "Q:  Did you communicate, at the time that the records were produced at—in the first instance—did you communicate with that production that the search was ongoing and more e-mail documents would be produced at a later date?
>
> "A:  I don't believe that I did."[2]

---

[2]     On this same issue, Sukumar's lawyer filed a declaration stating, "At no time before Sukumar's [p]etition was filed did [] Rodriguez or any other City employee tell me that searches for responsive documents were ongoing and that I could expect more documents to be identified and produced in the future."

E.  *Writ Petition*

After hearing nothing further from the City for about three weeks, on September 25, 2015, Sukumar filed a verified petition for a writ of mandate under the PRA.  There, he alleged that documents the City had produced "demonstrate that responsive records existing as recently as 2013 have not been produced."  He also alleged NCC employees took photographs of the Property that the City had not produced.  In addition to alleging the City had withheld responsive documents, Sukumar also alleged the City improperly redacted certain records by removing complainants' identifying information.

F.  *Postpetition Document Production*

About two weeks later, in mid-October 2015, Sukumar's attorneys met with Deputy City Attorney Catherine Richardson.  They asked Richardson to search for an e-mail dated September 2, 2014, pertaining to a complaint against the Property and/or Sukumar that had been referenced in another document the City had already produced.  Sukumar's lawyer believed this document was key because it instigated the reopening of the once-closed code enforcement action against Sukumar.  Richardson told them the writ petition was "premature" because the City was "still in the process of gathering and producing responsive documents."

On November 3, 2015, the City told Sukumar's lawyer to pay $925.28 for the search for pre-2007 e-mails.  A week later, counsel delivered the check.[3]

---

3    In January 2016 the City notified Sukumar's attorney that no responsive pre-2007 e-mails were located.

Between November 10, 2015 and January 12, 2016, the City retrieved about 900 post-2007 e-mails that were potentially responsive to Sukumar's request. Rodriguez reviewed them for responsiveness, and Richardson reviewed them for claims of exemption.

On January 13, 2016, the City produced 343 pages of redacted post-2007 e-mails. The City told Sukumar's attorney that additional unredacted e-mails would be produced "shortly" due to difficulty copying the e-mails in native format to a compact disk.

On February 1, 2016, the City produced another 204 pages of responsive e-mails, which the City stated were "all remaining emails of which the City was aware . . . ." However, at some time "shortly after February 1, 2016, the City produced an additional 105 responsive e-mails.

G. *March 2016*: *City Tells the Court Everything Has Been Produced*

Meanwhile, while the City was producing responsive records in January and February 2016, Sukumar's attorneys served the City with interrogatories and requests for admissions. Generally, these discovery requests were directed to discovering facts relevant to the City's claims of exemption and whether more responsive documents might exist. The City objected to these requests on the grounds discovery is not available in a writ proceeding under the PRA. Sukumar brought motions to compel.[4]

---

4     At the time, it was unclear whether the civil discovery rules applied to a writ proceeding under the PRA. In 2017 the court in *City of Los Angeles v. Superior Court* (2017) 9 Cal.App.5th 272 held such discovery is available.

On March 8, 2016, the court and counsel discussed the discovery dispute.  The court asked Richardson, "[W]hy doesn't the City just produce the record?"  Richardson replied, "*We did produce the record.*  The problem is that [Sukumar's] counsel doesn't believe that we've produced all the records.  [¶] . . . [¶] . . . We've told them *we've produced everything*, and they're convinced that we haven't.  [¶] So, that's where we stand."  (Italics added.)[5]

The court asked Richardson, "Your position is you've produced everything?"  She replied, "We've produced the records, yes, and that discovery is inappropriate."  Richardson volunteered to provide a sworn declaration attesting to the full and complete production of records under the PRA, stating, "*Your Honor, I'm happy to provide a verification that we've produced everything.*"  (Italics added.)

Stating he wanted to "cut to the chase," the court ordered the City to produce a "PMK under oath" to confirm the City produced all responsive documents.[6]

H.  *PMK Depositions*

On April 11, 2016, the City produced three witnesses for the ordered PMK deposition.  As explained next, as a direct result of these depositions, the City produced three new sets of documents responsive to Sukumar's PRA request.

---

[5]   The chronology of facts in the City's brief omits any mention of this March 8, 2016 hearing.  On our own motion, we augmented the record to include the reporter's transcript of this hearing.

[6]   "PMK" refers to person most knowledgeable.  Generally, under Code of Civil Procedure sections 2025.010 and 2025.230, a deposition can be taken of any entity by examining an officer or agent designated to testify on its behalf as the person most knowledgeable on matters specified in the deposition notice or subpoena.

10

1. *September 2, 2014 e-mail*

As the depositions were about to begin, Richardson gave Sukumar's attorney an e-mail dated September 2, 2014. This is the e-mail Sukumar's attorney asked Richardson to search for six months earlier, in October 2015.

Richardson said the City had not produced this e-mail earlier "because it could not be located in the NCC files or emails. The email was located by Sharren Carr who is a representative in Councilmember Sherri Lightner's office." After being served with the PMK deposition notices, Richardson asked City personnel "to check their files and emails again to verify that all responsive documents were produced." Carr found this e-mail as a result of that second look.

This September 2, 2014 e-mail is addressed to Mayor Faulconer, Councilperson Lightner, the San Diego Police Department, and Code Enforcement. The author (whose name the City redacted) begins by stating, "On June 30, 2014 I wrote to each of your offices and agencies to report the noise code violation by [] Sukumar . . . ." The e-mail states the "extraordinary noise caused by commercial fans installed at [] Sukumar's residence continues to roar from his home violating the peace of my home next door and the rest of the neighborhood . . . ."

2. *Five photographs from the S-drive*

Second, as a result of the PMK depositions, the City found and later produced five additional photographs of the Property, including two that appear to have been taken from *inside* Sukumar's garage by City personnel. These photographs came to light during the deposition of Gene Mavis, a NCC investigator. Mavis testified that photographs

11

taken by NCC staff are downloaded to a shared drive ("S-drive") on the City's computer system as well as printed and placed in the case file. Following Mavis's deposition, Richardson instructed City personnel to search the S-drive to verify the City had already produced all responsive photographs in response to Sukumar's PRA request. On April 19, 2016, the City notified Sukumar's attorney that five more responsive photographs had been discovered on the S-drive. Two of these photographs appear to be taken from inside Sukumar's garage. Two others show sound level readings, apparently taken outside the Property.

The same day, April 19, 2016, Richardson told Sukumar's attorneys that all responsive documents had now been produced, and she was "*at a loss as to what else you could possibly want or what else we could possibly provide.*"  (Italics added.)

3. *146 pages of e-mails*

However, about a month later, on May 11, 2016, the City produced another *146 pages* of additional responsive e-mails. Included in this production was the missing complaining neighbor's June 30, 2014 e-mail that apparently initiated the most recent City action against Sukumar.

I. *The Court Denies Sukumar's Writ Petition*

On June 24, 2016, the court denied Sukumar's writ petition. At the hearing, the court commented that by this point, the City "in some fashion" had produced all responsive documents and "[t]his isn't a case where they're refusing to produce something." The court found the City's delay in producing  responsive documents was reasonable, in part the result of mere oversight. The court also determined the City

properly redacted complainants' identifying information. After stating Sukumar's writ petition was "moot" because all responsive documents had now been produced, the court stated, "Now, you might argue that you're the prevailing party, because the City didn't comply until after the lawsuit was filed. That's another issue."[7]

J. *Attorney Fee Motion*

Asserting the litigation "motivated productions of a substantial amount of responsive public documents, even after the City represented to this [c]ourt there was nothing left to produce," Sukumar sought $93,695 in fees (plus $5,390 incurred in preparing the fee motion). At the hearing, Sukumar's attorney explained:

> "[O]n March the 8th . . . Ms. Richardson, on behalf of the City, in response to your inquiry, said, 'We've provided all of the records. We produced all of the records.' [¶] . . .
>
> " . . . They said at that point, it's done, but Your Honor allowed us to take the deposition of the PMK for the City, and it ended up being three people . . . .
>
> " . . . [T]he order of the PMK depositions motivated the City to look for more documents, and low [*sic*[ and behold, one of the key documents that had been described in the previously produced documents, but we didn't get it. The City said, 'We can't find it.' And low [*sic*] and behold, they found that and gave it to me on the day of the PMK deposition.
>
> "It's hard to say that the litigation did not motivate or activate the finding of that document.
>
> "And then we did the depositions, and . . . I found out about this S-drive, which nobody had looked at, that nobody, apparently, had

---

7    A writ petition is the exclusive means of appellate review of an order denying a petition for a writ of mandate under the PRA. (§ 6259, subd. (c).) Sukumar filed such a petition, which this court summarily denied.

13

done anything about.  Clearly, my questioning about the S-drive motivated the City to look at that S-drive, and low [*sic*] and behold, there are more photographs of my client's property on the S-drive from one of the City inspections.  [¶] . . .

"We got five more photographs that were found on the S-drive, and we got a hundred and—some hundred and 64 other pages of documents.  It's hard to say that the litigation did not motivate the City to look for and produce those documents or activated something or created a catalyst for it.  [¶] . . .

"Now, the question of the amount of attorneys' fees, that's a different question, but just the prevailing party, I don't see how that's [not] possible once all of the facts are considered."

The court denied the motion, finding the City "was not motivated by this lawsuit to produce the documents."  The court also found the litigation "did not substantially contribute to nor was it demonstrably influential in setting in motion the production of documents."

## DISCUSSION

### I.  *SUKUMAR PREVAILED BECAUSE THE UNDISPUTED FACTS SHOW THE LITIGATION CAUSED THE CITY TO RELEASE RESPONSIVE DOCUMENTS*

#### A.  *The PRA, In General*

The PRA generally provides for inspection of public records maintained by state and local agencies.  (*Pacific Merchant Shipping Assn. v. Board of Pilot Commissioners etc.* (2015) 242 Cal.App.4th 1043, 1046 (*Pacific Merchant*.)  Such "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state."  (§ 6250; *Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 425-426 (*Filarsky*).)

14

The PRA contains procedures to challenge a public agency's response to a records request. Section 6258 provides: "Any person may institute proceedings for injunctive or declarative relief or writ of mandate in any court of competent jurisdiction to enforce his or her right to inspect or to receive a copy of any public record" under the PRA.

A plaintiff prevailing in litigation under the PRA is entitled to attorney fees. (§ 6259, subd. (d).) This fee award "is mandatory if the plaintiff prevails." (*Filarsky, supra,* 28 Cal.4th at p. 427.) This serves to encourage "'members of the public to seek judicial enforcement of their right to inspect public records subject to disclosure.'" (*Galbiso v. Orosi Public Utility Dist.* (2008) 167 Cal.App.4th 1063, 1088 (*Galbiso*).)

B. *The Prevailing Party Standard in PRA Litigation*

In PRA litigation, the plaintiff may be a prevailing party even though the court did not enter judgment in his or her favor. (*Belth, supra,* 232 Cal.App.3d at p. 901.) As explained in *Belth*, "'Case law takes a pragmatic approach in defining [a prevailing party]. [Citation.]' 'In order to justify a fee award, there must be a causal connection between the lawsuit and the relief obtained.' [Citation.] 'However, a plaintiff need not achieve a favorable final judgment in order to be a successful party. A defendant's voluntary action induced by plaintiff's lawsuit will still support an attorneys' fee award on the rationale that the lawsuit spurred defendant to act or was a catalyst speeding defendant's response.' [Citation.] . . . 'If plaintiff's lawsuit "induced" defendant's response or was "material factor" or "contributed in a significant way" to the result achieved then plaintiff has shown the necessary causal connection.' [Citation.] A plaintiff is considered the prevailing party if his lawsuit motivated defendants to provide

15

the primary relief sought or activated them to modify their behavior [citation], or if the litigation substantially contributed to or was demonstrably influential in setting in motion the process which eventually achieved the desired result [citation]." (*Id.* at pp. 901-902.)

Thus, a plaintiff prevails within the meaning of section 6259, subdivision (d), "'"when he or she files an action which results in defendant releasing a copy of a previously withheld document." [Citation.]' [Citations.] An action . . . results in the release of previously withheld documents 'if the lawsuit motivated the defendants to produce the documents.'" (*Galbiso*, *supra*, 167 Cal.App.4th at p. 1085; see *Los Angeles Times v. Alameda Corridor Transportation Authority* (2001) 88 Cal.App.4th 1381, 1391.) Additionally, if a plaintiff succeeds in obtaining only partial relief, the plaintiff is entitled to attorney fees unless the plaintiff obtains results "that are so minimal or insignificant as to justify a finding that the plaintiff did not [in fact] prevail." (*Los Angeles Times*, at pp. 1391-1392.)

In sum, recovery under the catalyst theory turns on causation. The question whether the plaintiff prevailed, in the absence of a final judgment in his or her favor, is really a question of causation—the litigation must have resulted in the release of records that would not otherwise have been released.

However, a PRA plaintiff does not qualify as a prevailing party merely because the defendant disclosed records sometime after the PRA action was filed. There must be more than a mere temporal connection between the filing of litigation to compel production of records under the PRA and the production of those records. The litigation must have been the motivating factor for the production of documents. (*Rogers v.*

16

*Superior Court* (1993) 19 Cal.App.4th 469, 482 (*Rogers*); *Motorola Communication and Electronics, Inc. v. Department of General Services* (1997) 55 Cal.App.4th 1340, 1345 (*Motorola*).)  The key is whether there is a substantial causal relationship between the lawsuit and the delivery of the information.

C.  *The Standard of Review*

"We review a trial court's determination of whether a litigant is a prevailing party for abuse of discretion."  (*San Diegans for Open Government v. City of San Diego* (2016) 247 Cal.App.4th 1306, 1321-1322.)  "We accept the trial court's resolution of credibility and conflicting substantial evidence, and its choice of reasonable inferences from the evidence."  (*Ibid.*)  However, a trial court abuses its discretion when factual findings critical to its decision are not supported by substantial evidence.  (See *Silver Creek, LLC v. BlackRock Realty Advisors, Inc.* (2009) 173 Cal.App.4th 1533, 1539 [applying abuse of discretion standard to prevailing party determination under Civil Code section 1717].)

D.  *Analysis*

The trial court's finding that the City "was not motivated by this lawsuit" to produce responsive and material documents is not supported by substantial evidence.  As of March 8, 2016, the City unequivocally claimed it had produced every responsive nonexempt document.  The City's lawyer told the court, "We did produce the record" and had produced "everything."  She even offered to say so under penalty of perjury, volunteering "to provide a verification that we've produced everything" if the court desired.  The only reasonable inference from these undisputed facts is that but for the

17

subsequent court-ordered depositions, the City would not have searched for, nor produced any responsive documents after March 8, 2016.

The City's attorney did not produce the September 2, 2014 e-mail until the PMK depositions were about to start. The compelling inference from that undisputed fact is that *but for* the court-ordered PMK depositions, the City would not have produced that e-mail.

Similarly, it is indisputable that but for the court-ordered depositions, the City would not have produced the five photographs that were *only* on the City's S-drive. The City did not even think of searching the S-drive until its contents were revealed during Mavis's court-ordered deposition. Motivated by Mavis's deposition testimony, Richardson instructed City personnel to search the S-drive to verify that all responsive photographs had been produced. The only reasonable inference from these undisputed facts is that had the court not ordered the PMK depositions, the City would not have produced any of these five photographs. In fact, the City would not have even looked for them.

It is also undisputed that as a direct result of the court-ordered PMK depositions, Richardson instructed City personnel to search again for responsive e-mails. This resulted in the May 2016 production of *146 pages* of previously undisclosed e-mails.

In the face of the City's unequivocal assertion in March 2016 that it had already produced everything, the conclusion seems inescapable that but for Sukumar's persistent demand for discovery and the court-ordered depositions that resulted from those efforts, the City would not have produced any of the above-mentioned responsive documents.

18

E. *City's Contentions Unpersuasive*

Attempting to support the order denying Sukumar fees, the City contends it did not withhold any documents. The City asserts it told Sukumar's attorney that additional documents would be produced before he filed this litigation. The City argues this lawsuit did not motivate it to produce any "previously withheld" documents because the City had already agreed to produce all responsive documents before the lawsuit, was in the process of searching for additional responsive documents during the lawsuit, and ultimately produced all responsive documents after they were located.

However, the City's argument fails because it ignores this crucial fact: On March 8, 2016, the City told the court and Sukumar that it had produced *everything* and there was nothing more to produce. The deputy city attorney was so convinced there were no responsive nonexempt documents to be produced, she even offered to so attest under penalty of perjury. Assuming these representations were made in good faith and believed to be true—the City would not have continued searching for documents it had just claimed did not even exist.

However, the PMK depositions proved these representations to be incorrect. As of March 8, 2016, the City had not produced the September 2, 2014 e-mail, the five photographs of the Property only on the S-drive, and 146 pages of additional responsive e-mails.

The City correctly states there is no evidence it intentionally withheld known responsive documents. At the hearing on the fee motion, even Sukumar's attorney admitted there was no evidence City representatives acted in bad faith.

19

However, bad faith is not the test. The *effect* of the City's inability or unwillingness to locate and produce these documents until court-ordered discovery ensued after March 8, 2016, is tantamount to withholding requested information from a PRA request. (See *Community Youth Athletic Center v. City of National City* (2013) 220 Cal.App.4th 1385, 1425 ["The effect of the City's inability or unwillingness to locate the records had the same effect as withholding requested information from the public."].)

The City also contends *Rogers, supra,* 19 Cal.App.4th 469 "is on point" and establishes that Sukumar cannot be deemed a prevailing party. However, the facts in *Rogers* are significantly different from the operative facts here. In *Rogers,* the petitioner filed his complaint on June 26, 1992. (*Id.* at p. 482.) A mere six days later, on July 1, the public agency produced the requested records, based on a records search it had initiated several weeks earlier, *before* Rogers commenced the PRA litigation. (*Id.* at pp. 482-483.) Thus, *Rogers* is a case where the litigation did not trigger production or motivate the public agency to produce documents. The documents in *Rogers* would have been produced even if the litigation had not been filed because they were produced based on a search in progress when the lawsuit was commenced.

In sharp contrast here, the undisputed evidence is that as of March 8, 2016, the City firmly believed it had already produced everything. Unlike the situation in *Rogers, supra,* 19 Cal.App.4th 469, but for the litigation and its court-ordered depositions, the City would never have produced the post-March 2016 documents.

The City's reliance on *Motorola, supra,* 55 Cal.App.4th 1340 is similarly misplaced. There, Motorola requested the public agency to produce certain documents.

20

When the agency failed to comply to Motorola's satisfaction, Motorola filed a petition for a writ of mandate. (*Id.* at pp. 1341-1342.) The day after the superior court issued an alternative writ commanding the agency to comply with the records request, the agency produced additional documents. The evidence established this production was not prompted by the litigation, but rather the delay in production was due to uncertainty over the scope of the request and administrative "difficulties"—the unavailability of critical personnel to process the records request. (*Id.* at pp. 1344, 1346.) The *Motorola* court, therefore, found that the records would have been produced ultimately, whether or not suit was filed. (*Id*. at p. 1346.)

*Motorola, supra,* 55 Cal.App.4th 1340 is off point because here, as of March 8, 2016, the City believed it had produced every responsive document. The delay in producing documents here was not due to uncertainty over the scope of Sukumar's request, or the absence of key personnel to process the records request. The City never claimed it did not understand what Sukumar was seeking, or that it lacked the personnel to find and produce the responsive records.

Rather, the City's response in March 2016 was it had performed a comprehensive search and had already produced everything. The court-ordered depositions proved the City's March 2016 position to be significantly mistaken.

Unlike the facts in *Motorola,* the undisputed evidence here shows there would have been no April-May 2016 production of responsive documents without the PMK depositions. And there would have been no PMK depositions without this litigation. Therefore, the undisputed evidence compels the conclusion that Sukumar's writ petition

21

motivated the City to produce material responsive documents. Therefore, Sukumar must be deemed a prevailing party entitled to attorney fees under section 6259, subdivision (d). (*Galbiso*, *supra*, 167 Cal.App.4th at p. 1085 [a plaintiff prevails under section 6259, subd. (d) when the lawsuit "motivated the defendant[] to produce the documents"].)

F. *Amount of Fees*

In addition to challenging Sukumar's entitlement to an attorney fees award, the City also challenged the amount he claimed. The City asserted many hours of claimed attorney time was excessive in light of the task performed and counsel's experience, and such claimed fees should be substantially reduced or in some cases entirely rejected. Because the court determined Sukumar was not entitled to any fees, the court never reached this issue.

Section 6259, subdivision (d) provides the court "shall award court costs and reasonable attorney fees to the plaintiff should the plaintiff prevail in litigation filed pursuant to this section." On remand, the court should determine the appropriate amount to award, considering a number of factors, "'"including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case."'" (*Pacific Merchant, supra,* 242 Cal.App.4th at p. 1061.)

## DISPOSITION

The order denying Sukumar's motion for attorney fees is reversed with directions to enter a new order determining that Sukumar is the prevailing party. On remand, the

court is directed to determine the amount of reasonable attorney fees and costs Sukumar

is entitled to under section 6259, subdivision (d).

Sukumar is also entitled to costs incurred on appeal.


NARES, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.


23