Filed 5/11/22 Certified for Publication 6/3/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF WATER RESOURCES ENVIRONMENTAL IMPACT CASES. | C091771 <br><br> (JCCP No. 4942) <br><br> (Sacramento Super. Ct. Nos. 34-2017-00215965, 34-2017-80002666, 34-2017-80002667, 34-2017-80002674, 34-2017-80002676, 34-2017-80002677-CU-WM-GDS, 34-2017-80002678, 34-2017-80002680; San Joaquin Super. Ct. No. STK-CV-UWM-2017-0008624) |

Plaintiffs in this coordinated proceeding appeal from postdismissal orders denying their motions for attorney fees under Code of Civil Procedure section 1021.5, the private attorney general statute. In 2017, plaintiffs filed petitions against defendant Department

1

of Water Resources (DWR) challenging the California WaterFix (WaterFix), a proposal to improve the State's water supply infrastructure by constructing two 35-mile-long tunnels that would convey fresh water from the Sacramento River to pumping stations in the southern Sacramento–San Joaquin Delta (Delta). The lawsuits sought to compel DWR to rescind the WaterFix approvals, decertify the environmental impact report (EIR), and suspend activities related to the project until DWR complied with applicable laws. Most of the plaintiffs also filed answers opposing a separate action filed by DWR to validate the project's bond financing. Plaintiffs' lawsuits were coordinated for trial with other lawsuits, and with DWR's validation action, as Judicial Council Coordination Proceeding No. 4942. (Cal. Rules of Court, rule 3.550.)

In 2019, while the coordination proceeding was pending, California's newly elected Governor announced that he did not support WaterFix's dual tunnel proposal and directed DWR to instead pursue a single tunnel conveyance. Shortly thereafter, DWR decertified the EIR and rescinded the project approvals. Consequently, all pending actions, including the validation suit, were dismissed.

After the cases were dismissed, plaintiffs filed motions for attorney fees, asserting that they were "successful" parties under the catalyst theory because the litigation motivated DWR to voluntarily provide the relief sought in their petitions and answers. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 560, 566 (*Graham*).) The trial court denied the motions, concluding that although plaintiffs may have received the primary relief sought, the lawsuits did not cause DWR to provide that relief.

On appeal, plaintiffs argue that (1) the trial court failed to apply the correct legal standard in determining there was no causal connection between the litigation and the relief obtained; and (2) the trial court's finding of no causation is not supported by substantial evidence. We conclude that the trial court failed to apply the correct legal standard and therefore failed to consider all relevant evidence in the record. We shall reverse the trial court's order and remand for redetermination of the issue.

2

BACKGROUND FACTS AND PROCEDURE

Formed by the confluence of the state's two largest rivers, the Delta is a "critically important natural resource for California and the nation." (Wat. Code, § 85002; *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1031 (*Delta Stewardship*).)[1] It provides habitat for a vast array of aquatic and terrestrial species, offers a wide variety of recreational activities, supports extensive statewide infrastructure, and sustains a productive agricultural landscape rich in culture and history. (§§ 12981, subds. (a), (b), 85002, 85022, subds. (c), (d); Pub. Resources Code, §§ 29701, 29708; *Delta Stewardship, supra*, 48 Cal.App.5th at pp. 1027, 1030-1031, 1033.)

The Delta also serves as the hub of California's water supply infrastructure. (§§ 85002, 85004; *Delta Stewardship, supra*, 48 Cal.App.5th at p. 1033.) "Two major water systems[,] the federal Central Valley Project . . . and California's State Water Project . . . [,] divert water from the Delta and convey water previously stored in upstream reservoirs through the Delta, primarily for urban and agricultural uses in . . . the San Francisco Bay Area, Central Valley, Central Coast, and Southern California." (*Delta Stewardship*, at p. 1033, fn. omitted.) More than two-thirds of California residents and millions of acres of farmland rely on water exported from the Delta watershed. (§ 85004.) As a result, approximately half of the water that historically flowed into and through the Delta is now diverted for human use. (*Delta Stewardship*, at p. 1033.) Located on the southeast edge of the Delta, two sets of pumps, one each for the Central Valley Project (CVP) and the State Water Project (SWP), extract millions of acre-feet of water from the Delta and convey it through a system of reservoirs and canals to other parts of the state. (*Id*. at p. 1033 & fn. 8; *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1152-1153.)

---

[1] Undesignated statutory references are to the Water Code.

Competing demands for resources have left the Delta and California's water supply infrastructure in a state of crisis. (§ 85001, subd. (a); *Delta Stewardship, supra*, 48 Cal.App.5th at pp. 1027-1028, 1035.) Problems include the declining health of the ecosystem, degraded water quality, subsidence of Delta lands, levee system integrity, and risks to water supply reliability. (See *Delta Stewardship*, at pp. 1032, fn. 6, 1034-1035; *In re Bay-Delta etc., supra*, 43 Cal.4th at pp. 1151, 1153.)

A.       *The twin tunnels proposal*

To address the Delta's problems, in or about 2006, DWR began working on a proposal to modernize and improve the existing Delta water conveyance system. As originally proposed, the project—then known as the Bay Delta Conservation Plan—consisted of two components: a new water conveyance facility and a long-term habitat conservation plan/natural communities conservation plan for the greater Delta area. The proposed water conveyance facility would consist of three new fish-screened intakes and two tunnels designed to divert water from the Sacramento River in the north Delta and convey it approximately 35 miles to the south Delta near the existing CVP/SWP pumps. The "twin tunnels" were not intended to replace the existing through-Delta conveyance system, but to instead create a second facility that could be operated in conjunction with existing facilities, adding flexibility and resiliency to the water supply system.

In 2013, DWR and the United States Bureau of Reclamation (among others), acting as joint lead agencies, issued a draft EIR for the Bay Delta Conservation Plan project under the California Environmental Quality Act (CEQA).[2] The draft EIR considered the environmental impacts of the proposed project as well as 15 alternatives,

---

[2]      The EIR also served as an environmental impact statement for purposes of the National Environmental Policy Act of 1969. (42 U.S.C. § 4321 et seq.) For simplicity, future references will refer only to DWR's efforts to comply with CEQA.

4

which differed in location, design, and operation from the proposed conveyance facilities and habitat restoration plan.

In 2015, in response to comments on the draft EIR, DWR substantially altered the project, replacing the proposed Bay Delta Conservation Plan (alternative 4) with the WaterFix project (alternative 4A). Although the proposed water conveyance facilities were essentially unchanged, the new WaterFix proposal decoupled the habitat conservation and natural communities conservation plan elements.

In July 2015, DWR issued a partially recirculated draft EIR for the revised project. The recirculated draft EIR maintained all the alternatives analyzed for the original Bay Delta Conservation Plan project, while adding three new diversion and conveyance alternatives (alternatives 2D, 4A, and 5A) that did not have habitat and natural communities conservation plan components. Notably, a single tunnel conveyance was included among the alternatives analyzed (alternative 5a) in the EIR.

Plaintiffs submitted comments in response to the draft EIR and recirculated draft EIR.

On July 21, 2017, DWR certified a final EIR, adopted findings, a statement of overriding considerations, a mitigation monitoring and reporting plan, and approved the WaterFix project. It also adopted resolutions authorizing revenue bond financing and filed a validation action to confirm its validity.

B.     *Plaintiffs' lawsuits*

In August 2017, plaintiffs (among others) filed lawsuits challenging DWR's certification of the final EIR and approval of the WaterFix project. Although the allegations vary, in general, the lawsuits alleged that DWR violated CEQA by failing to adequately and accurately describe the project; defining project objectives too narrowly; using an improper baseline; piecemealing the environmental analysis; failing to adequately identify, analyze, and mitigate the project's impacts (especially to water quality and hydrology); failing to consider a reasonable range of alternatives; failing to

5

recirculate the final EIR; failing to adequately consult with stakeholders and meaningly respond to public comments; and adopting findings that are not supported by substantial evidence. Plaintiffs also alleged violations of the Sacramento–San Joaquin Delta Reform Act of 2009 (§ 85000 et seq.), the public trust doctrine, and the California Endangered Species Act. (Fish & G. Code, § 2050 et seq.)

The relief sought was to compel DWR to rescind the project approvals, decertify the EIR, and suspend all activities related to the project until DWR complied with CEQA and other applicable laws.

Most of the plaintiffs also filed answers opposing DWR's validation action. Those parties asserted affirmative defenses based on DWR's alleged failure to comply with CEQA and other laws.

In early 2018, while the litigation was pending, DWR disclosed that it was preparing a draft supplemental EIR to evaluate a possible phased implementation of the WaterFix project. Under the proposal, construction of the project would have proceeded in two stages. In the first stage, DWR would construct one tunnel with two intakes, for a total capacity of 6,000 cubic feet per second. In the second stage, DWR would construct a second tunnel and a third intake with an additional capacity of 3,000 cubic feet per second. The purpose of the draft supplemental EIR was to evaluate the potential environmental impacts of the staged implementation option. In the end, DWR decided not to pursue staged implementation and the supplemental EIR was never certified.

C.     *Related proceeding*

In 2018, DWR filed a certification of consistency with the Delta Stewardship Council (the Stewardship Council), a prerequisite to implementation of the WaterFix project. (§ 85225.) Several of the plaintiffs appealed the certification, contending that the WaterFix project was not consistent with local land use plans or the Delta Plan. (§§ 85001, subd. (c), 85059, 85300.) In November 2018, Stewardship Council staff released a draft determination that DWR failed to support its consistency finding with

6

substantial evidence. The Stewardship Council urged DWR to withdraw its consistency determination, which DWR did on December 7, 2018.

D. *The change to a single tunnel project*

On February 12, 2019, newly elected Governor Gavin Newsom announced in his first State of the State address that California needed a "fresh approach" to meeting the state's water challenges. In the course of outlining his new water policy, Governor Newsom stated: "I do not support the Water Fix as currently configured. Meaning, I do not support the twin tunnels. But we can build on the important work that's already been done. That's why I support a single tunnel." This announcement was consistent with an earlier statement by the Governor, published the day he was elected, November 6, 2018, in which he signaled his doubts about a two-tunnel solution: " 'I think if we walk down the path of two tunnels, we're in litigation and no project.' "

DWR did not immediately rescind the project approvals or decertify the WaterFix EIR. At a case management conference held a couple of weeks after the State of the State address, DWR informed the court that it was still assessing the impact of the Governor's State of the State declaration on the WaterFix project. Counsel explained that regardless of the path DWR ultimately took—a supplemental/subsequent EIR or a new EIR—work on the CEQA record should continue because the documents "will inevitably be part of any future CEQA record." DWR also argued that the validation action should continue because the validity of the revenue bond financing was not dependent on whether the water conveyance facilities included one tunnel or two.

On April 29, 2019, Governor Newsom issued Executive Order No. N-10-19 (Executive Order), establishing his new "water resilience portfolio" policy. Among other things, the Executive Order directed DWR (as part of the California Natural Resources Agency) to "inventory and assess" the "[c]urrent planning to modernize conveyance through the Bay Delta with a new single tunnel project."

7

On May 2, 2019, DWR decertified the WaterFix EIR, vacated its findings, and rescinded the project approvals. Less than a week later, DWR rescinded the bond resolutions that were the subject of the validation action.

In an explanatory memorandum, DWR's Director, Karla A. Nemeth, explained that DWR rescinded the approvals to align DWR's work with the Governor's vision for a one-tunnel conveyance. The memorandum stated that even though DWR believed the WaterFix EIR complied with CEQA, DWR chose to decertify the report because there was "no longer an underlying project approval" attached to it. The memorandum stated that DWR would begin a "new transparent environmental review process in compliance with CEQA." In a letter to state water project contractors, Nemeth stated that the new environmental review would allow for a "more realistic understanding of potential impacts and mitigation" consistent with CEQA.

DWR also released a document titled "Modernizing Delta Conveyance Infrastructure Q&A." That document stated that the new single tunnel, smaller capacity project would allow DWR to incorporate the latest science and engineering and "updated information to minimize impacts." It further explained that the Governor is committed to a "more transparent and collaborative process with Delta stakeholders to better communicate the impacts and to work together to explore new ideas for addressing these issues." The document stated that the new approach would allow DWR to engage with stakeholders to "avoid and minimize the impacts that concern Delta communities the most."

Subsequently, in an interview published in "The Water Report—Water Rights, Water Quality & Water Solutions in the West," *California Water Resources* (Oct. 15, 2019) Issue #188, page 18, presented as evidence by plaintiffs, Nemeth was asked how the new, one-tunnel proposal differed from the earlier (twin tunnel) proposals. She reportedly acknowledged that " 'previous proposals may not have fully acknowledged and mitigated for their impacts.' " (*Id*. at p. 21.) She reportedly also stated that she

8

" 'believes stakeholders should be given a more prominent role in expressing localized impacts,' " and " 'thinks doing so will create better environmental impact reports and create the opportunity to mitigate through improved engineering and design.' " (*Ibid.*) And during a panel discussion about the change entitled "Reaching Consensus in the Delta Watershed" at the Water Education Foundation's 36th Annual Water Summit on October 30, 2019, presented as evidence by plaintiffs, Nemeth commented that "having been around the original project and a whole variety of incarnations, . . . I think that environmental document started to have a Winchester Mystery House aspect to it."

E.      *Attorney fee motions*

The coordinated cases were voluntarily dismissed in light of DWR's actions rescinding the project approvals and decertifying the EIR.

After the cases were dismissed, plaintiffs filed motions for attorney fees under Code of Civil Procedure section 1021.5. The fee motions rested on the "catalyst" theory that the litigation caused DWR to voluntarily provide the primary relief sought, namely, rescission of the project approvals, decertification of the EIR, and dismissal of the validation action.

DWR opposed the motions, relying heavily on Director Nemeth's testimony that she made the decision to rescind WaterFix solely to implement the Governor's policy directive, not because of the litigation.[3] Apart from the Executive Order, no evidence was presented by DWR regarding the Governor's motivation for his change in policy.

The trial court issued a tentative ruling denying the fee motions. The court found that even if the moving parties received the primary relief sought in their petitions and

---

[3]      DWR also disputed that some of the moving parties achieved the primary relief sought in their lawsuits, which it characterized as prohibiting any new water exports (or, in the case of plaintiff North Delta Water Agency, analyzing and mitigating water quality impacts related to a 1981 contract).

9

answers, they were not responsible for motivating DWR to provide that relief. Rather, DWR was motivated by the Governor's directive for a single tunnel conveyance. No party requested oral argument and the court's tentative ruling became the final order of the court.

After the hearing, plaintiffs filed a joint request for rulings on their evidentiary objections to (1) portions of the declaration of Director Nemeth; (2) the declaration of Gary Greenfield, DWR's expert witness; and (3) DWR's request for judicial notice. In a separate order, the trial court denied the request on the grounds the evidence was not material to its ruling.

Plaintiffs timely appealed the court's orders denying their fee motions.[4]

## DISCUSSION

## I

### *Background Law*

The Legislature adopted Code of Civil Procedure section 1021.5, a codification of the private attorney general doctrine, as an exception to the general rule that litigants are to bear their own attorney fees. (*Graham, supra*, 34 Cal.4th at p. 565.) " '[T]he private attorney general doctrine "rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." ' " (*Ibid*.) The fundamental purpose of the doctrine is to encourage suits enforcing important public policies by rewarding attorneys who successfully prosecute such cases and prevent worthy claimants from being silenced or stifled by a lack of legal resources. (*Id*. at pp. 565, 568.)

---

[4] We exercise our discretion to treat any premature notices of appeal from the attorney fee orders as timely. (Cal. Rules of Court, rule 8.104(d)(2).)

10

To qualify for fees under the statute, a plaintiff must show that (1) it is a successful party; (2) the action resulted in the enforcement of an important right affecting the public interest; (3) a significant benefit was conferred on the general public or a large class of persons; and (4) the necessity of private enforcement and the attendant financial burden make an award of fees appropriate. (*Coalition for a Sustainable Future in Yucaipa v. City of Yucaipa* (2015) 238 Cal.App.4th 513, 520-521 (*Yucaipa*).)

Our Supreme Court has taken a "broad, pragmatic" view of what constitutes a successful party for purposes of Code of Civil Procedure section 1021.5. (*Graham, supra*, 34 Cal.4th at p. 565.) The trial court " ' "must realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award" under [Code of Civil Procedure] section 1021.5.' " (*Graham*, at p. 566.)

It is not necessary for a plaintiff to obtain a judgment in its favor to qualify as a successful party. (*Yucaipa, supra*, 238 Cal.App.4th at p. 521.) In *Graham*, our Supreme Court endorsed the "catalyst theory" of attorney fees, under which plaintiffs may be considered successful if their lawsuit caused the defendant to voluntarily provide the relief sought. (*Graham, supra*, 34 Cal.4th at pp. 560-561, 568.) Under the catalyst theory, attorney fees may be awarded even when litigation does not result in a judicial resolution if the defendant voluntarily changes its behavior substantially because of, and in the manner sought by, the litigation. (*Id*. at p. 560.) The catalyst theory is an application of the principle that courts look to the practical impact of the litigation, not the manner of its resolution. (*Id*. at p. 566.) Thus, a plaintiff may be a "successful party" whenever it obtains the relief sought in its lawsuit, regardless of whether that relief is obtained through a judgment, settlement, or voluntary change in the defendant's conduct. (*Id*. at p. 567; see also *Zuehlsdorf v. Simi Valley Unified School Dist.* (2007) 148 Cal.App.4th 249, 257 [plaintiff may be a prevailing party when the defendant's voluntary compliance moots the controversy]; accord, *Coalition for Economic Survival v.*

11

*Deukmejian* (1985) 171 Cal.App.3d 954, 962.) However, the moving party must establish that (1) its "lawsuit was a catalyst motivating the defendants to provide the primary relief sought;" (2) "the lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense[;]"[5] and (3) it "reasonably attempted to settle the litigation prior to filing the lawsuit." (*Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, 608.)

To satisfy the first (causation) prong, the plaintiff need not show the litigation was the only cause of defendant's acquiescence. (*Skinner v. Ken's Foods, Inc.* (2020) 53 Cal.App.5th 938, 946 (*Skinner*).) The litigation need only be a " 'substantial factor' " contributing to the relief obtained. (*Ibid.*; accord, *Yucaipa, supra*, 238 Cal.App.4th at p. 522.)

But the plaintiff cannot be a successful party by obtaining just any relief. (*Bowman v. City of Berkeley* (2005) 131 Cal.App.4th 173, 177.) In catalyst cases, the plaintiff must show its lawsuit was a catalyst motivating the defendant to provide the *primary* relief sought in the litigation. (*Id.* at p. 178; *California Public Records Research, Inc. v. County of Yolo* (2016) 4 Cal.App.5th 150, 191.) Thus, when a plaintiff seeks fees under a catalyst theory, courts generally must conduct the following inquiry: (1) identify the plaintiff's primary litigation objectives, (2) compare the results obtained to determine whether the plaintiff in fact achieved those objectives, and, if so, (3) decide

---

[5]    In determining whether a lawsuit achieved the result by threat of victory, rather than by dint of nuisance and threat of expense, the trial court is to inquire not into the defendant's subjective belief about the suit, but rather to gauge, objectively speaking, whether the lawsuit had merit. (*Graham, supra*, 34 Cal.4th at p. 575.) Our Supreme Court has defined merit, for purposes of the catalyst rule, to mean " 'not frivolous, unreasonable, or groundless,' " i.e., that the questions of law or fact are " ' "grave and difficult." ' " (*Id.* at pp. 575, 576.) A moving party is not required to prove that it would have prevailed on the merits or that defendant's conduct was required by law. (*Id.* at p. 575; *Belth v. Garamendi* (1991) 232 Cal.App.3d 896, 902.)

whether the lawsuit was a material factor or contributed in a significant way to those results. (*Yucaipa, supra*, 238 Cal.App.4th at pp. 521-522; *Graham, supra*, 34 Cal.4th at pp. 566-567; *Hogar Dulce Hogar v. Community Development Com. of City of Escondido* (2007) 157 Cal.App.4th 1358, 1366.)

Because defendants usually are reluctant to concede that litigation induced them to provide the relief sought, "[c]lues to the provocative effects of the plaintiffs' legal efforts are often best gleaned from the chronology of events . . . ." (*Posada v. Lamb County* (5th Cir. 1983) 716 F.2d 1066, 1072; *Skinner, supra*, 53 Cal.App.5th at p. 947, citing *MacDonald v. Ford Motor Co.* (N.D.Cal. 2015) 142 F.Supp.3d 884, 891.) "When, after litigation is initiated, a defendant has voluntarily provided the relief a plaintiff is seeking, the chronology of events may raise an inference that the litigation was the catalyst for the relief." (*Yucaipa, supra*, 238 Cal.App.4th at p. 522, citing *Hogar Dulce Hogar v. Community Developments Com. of City of Escondido, supra*, 157 Cal.App.4th at p. 1366.) This shifts to the defendant the burden to produce evidence to rebut that inference. (*Californians for Responsible Toxics Management v. Kizer* (1989) 211 Cal.App.3d 961, 968.) The ultimate burden of proof, however, remains on the claimant to establish each element of the statute. (*Tipton-Whittingham v. City of Los Angeles, supra*, 34 Cal.4th at p. 608; *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2010) 187 Cal.App.4th 376, 381.)

II

*Standard of Review*

We review a trial court's determination of whether a litigant is a prevailing party for abuse of discretion. (*Sukumar v. City of San Diego* (2017) 14 Cal.App.5th 451, 464 (*Sukumar*).) To determine whether the trial court abused its discretion, we must review the entire record, paying particular attention to the court's stated reasons and whether it applied the proper standards of law in reaching its decision. (*California Public Records Research, Inc. v. County of Yolo, supra*, 4 Cal.App.5th at p. 191.) " 'We accept the trial

13

court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences that can be drawn from the evidence.' [Citation.]" (*Sukumar, supra*, at p. 464.)

However, we will find an abuse of discretion if the trial court based its decision on improper criteria or an incorrect legal standard, or if factual findings critical to the decision are not supported by substantial evidence. (*Sukumar, supra*, 14 Cal.App.5th at p. 464; *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298.) To be " 'substantial,' " evidence must be reasonable, credible, and of solid value. (*Rivard v. Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 409-410.) A finding is not supported by substantial evidence if there is no reasonable basis for it in the record. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633; *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 354-355.)

III

*Analysis*

In denying the fee motions, the trial court stated that even if plaintiffs "may have received the primary relief they sought" in their lawsuits, "they were not responsible for motivating DWR to provide that relief." Instead, the court held that DWR's decision to rescind the WaterFix approvals was motivated by an "external" cause, namely, the Governor's directive for a single tunnel conveyance, which made the WaterFix obsolete.

Plaintiffs contend that the trial court applied an incorrect legal standard in denying the fee motions. Specifically, they contend the court erred by (1) requiring plaintiffs to show the lawsuits were "the" cause of DWR's actions, rather than "a" substantial contributing factor; (2) improperly relying on DWR's subjective opinion of the merits of the lawsuits; (3) failing to consider how DWR modified its behavior in response to the litigation; and (4) treating the Governor's policy directive as an external, superseding cause. The determination of the correct legal standard to be applied presents a question

14

of law, which we review de novo. (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 932.)[6]

Although we reject most of plaintiffs' contentions, we agree that the trial court erred in treating the Governor's policy directive as an external, superseding cause. "The supreme executive power of this State is vested in the Governor." (Cal. Const., art. V, § 1.) DWR, as an agency within the executive branch of the state, is under the Governor's control. (§ 120.) Thus, when the Governor directed DWR to shift from two tunnels to one, DWR was obliged to implement his decision by replacing WaterFix with a single tunnel conveyance. But, contrary to the trial court's conclusion, this does not ipso facto mean there is no connection between the lawsuits and decertification of the EIR and rescission of the WaterFix approvals. It merely begs the question: Was the litigation a substantial factor or significant catalyst in the *Governor's* decision?

Although DWR did not provide any evidence relevant to this question, plaintiffs presented evidence suggesting that the Governor's decision may have been influenced, at least in part, by the litigation. Specifically, plaintiffs presented evidence that, before he took office, Governor Newsom expressed general concerns about the litigation, stating: " 'I think if we walk down the path of two tunnels, we're in litigation and no project.' " Plaintiffs also presented evidence that DWR's director admitted that " 'previous proposals may not have fully acknowledged and mitigated for their impacts,' " especially with regard to impacts on local Delta communities. Although we express no opinion on the ultimate question, the trial court should have weighed this evidence in deciding

---

**6**    DWR argues that plaintiffs forfeited any claim based on the legal standard by failing to request oral argument on the tentative ruling. However, a failure to object to a tentative ruling does not result in forfeiture if the argument was previously raised. (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406.) The record shows that plaintiffs argued the court must consider the Governor's motivation and that CEQA did not require DWR to decertify the EIR. This was sufficient to avoid forfeiture, even if plaintiffs did not specifically object to the court's tentative ruling.

whether the WaterFix litigation was a catalyst in the state's decision to cancel the WaterFix project. Having treated the Governor's change in policy as an intervening cause that was separate from the litigation, the trial court based its decision on improper criteria and failed to consider all the relevant evidence before it. (*Johns v. City of Los Angeles* (1978) 78 Cal.App.3d 983, 998 [consideration of all evidence essential to proper exercise of discretion].)

The court further erred in assuming that decertification of the EIR and rescission of the bond resolutions was "expected" given the purported obsolescence of the WaterFix EIR.

As DWR concedes in its opening brief: "Parties seeking to recover fees under the catalyst theory may . . . use the chronology of events surrounding the litigation to 'raise an inference that the litigation was the catalyst for relief.' " In this case, plaintiffs relied on the chronology of events to raise an inference that the lawsuits were a catalyst motivating DWR's decision to decertify the EIR and rescind the bond approvals. This shifted to DWR the burden to rebut that inference. (*Californians for Responsible Toxics Management v. Kizer, supra*, 211 Cal.App.3d at p. 968.)

In opposing the attorney fee motions, DWR submitted a declaration from Director Nemeth, who stated that she made the decision to decertify the WaterFix EIR and rescind the bond resolutions "to maximize DWR's flexibility" in moving forward with implementing the Governor's directive for a single tunnel conveyance. However, the trial court did not rely on this evidence, finding it immaterial to its decision. Instead, the court assumed that "[g]iven the obsolescence of WaterFix and its replacement by the single tunnel conveyance under the Governor's water resilience portfolio, DWR's decertification of the WaterFix [final EIR] and the rescission of WaterFix . . . bond resolutions was *to be expected*." (Italics added.) This assumption, however, was not supported by the law or the facts.

16

First, nothing in CEQA required DWR to decertify the WaterFix EIR. Under CEQA, the certification of an EIR is separate from project approval. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1199-1200.) Project approval must follow, not precede, the certification of an EIR. (Cal. Code Regs., tit. 14, §§ 15090, subd. (a), 15092, subd. (a).) Once a project has been subject to environmental review and received approval, no further steps to comply with CEQA are required unless a further discretionary approval is necessary. (*Willow Glen Trestle Conservancy v. City of San Jose* (2020) 49 Cal.App.5th 127, 131-132.) And an EIR may remain in place even if the underlying project is abandoned or withdrawn. (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 17 Cal.App.5th 413, 423-424.)

If another discretionary approval is required, such as when a modified or supplemental project is proposed, the agency must determine whether further environmental review is required due to changes in the project, changes in circumstances, or new information. (*Willow Glen Trestle Conservancy v. City of San Jose, supra*, 49 Cal.App.5th at p. 131; Pub. Resources Code, § 21166; Cal. Code Regs., tit. 14, § 15162.) If so, the agency may prepare a subsequent or supplemental EIR to make the previous EIR adequate. (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 604, 606, fn. 26.) To determine whether the agency may proceed under CEQA's subsequent review provisions, the question is not whether the changes render a project "new" in an abstract sense, but whether the original environmental document retains some informational value relevant to the ongoing decisionmaking process. (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 951-952.) Only when the previous environmental document is "wholly irrelevant" must the agency start anew. (*Id*. at p. 951.) Thus, while CEQA does not prohibit an agency from decertifying an EIR when an approved project is modified or replaced by an alternative, it is not necessarily an "expected" outcome.

17

Second, the Governor's Executive Order did not compel DWR to decertify the EIR or rescind the bond approvals. The Executive Order merely directed DWR to "inventory and assess: [¶] . . . [¶] f. Current planning to modernize conveyance through the Bay Delta with a new single tunnel project." This was consistent with the Governor's previously stated intent to "build on the important work" that already had been done.

Third, DWR's own conduct and statements contradict the court's assumption that decertification of the EIR was "expected." After the Governor's State of the State address in February 2019, DWR's attorneys advised the court that DWR had options as to how to proceed under CEQA, including a possible supplemental or subsequent EIR. After all, the WaterFix EIR evaluated a single tunnel alternative, and DWR had previously supplemented its EIR to address significant changes in the project. That DWR instead decided to abandon its years-long environmental review and begin the process anew raised a legitimate question as to *why* it made that choice. (*Graham, supra*, 34 Cal.4th at p. 573 ["the defendant in such cases knows better than anyone why it made the decision that granted the plaintiff the relief sought, and the defendant is in the best position to either concede that the plaintiff was a catalyst or to document why the plaintiff was not"].) But the trial court never answered that question because it relied on the false assumption that DWR's decision was compelled by the Governor's policy directive.

Likewise, before rescinding the bond approvals, DWR had argued that the validation action should continue because the validity of the bond financing was not dependent on whether the water conveyance facilities included one tunnel or two. DWR ultimately reversed course, rescinding the bond resolutions and dismissing the validation action. Director Nemeth explained that this was done to ensure "maximum flexibility" with respect to financing a single tunnel conveyance. The trial court never made this explanation part of its inquiry because it concluded the only evidence material to its

18

decision was Nemeth's declaration that she rescinded the bond resolutions to implement the Governor's policy directive.

In sum, the trial court abused its discretion by applying the wrong standard in assessing the causation element. The trial court erroneously treated the Governor's policy directive as an external, superseding cause of the relief obtained, and failed to consider whether plaintiffs' lawsuits were a substantial factor in the Governor's decision to pivot away from the dual tunnel WaterFix project and/or DWR's decisions to decertify the WaterFix EIR and rescind the bond resolutions. Accordingly, we will reverse the trial court's order and remand for the trial court to reconsider its decision in accordance with the standards set forth in this opinion. (*Dyer v. Department of Motor Vehicles* (2008) 163 Cal.App.4th 161, 174; *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15; *Doe v. Westmont College* (2021) 60 Cal.App.5th 753, 763; *Godinez v. Schwarzenegger* (2005) 132 Cal.App.4th 73, 94.)

For guidance on remand, we emphasize that an award of attorney fees is appropriate under the catalyst theory only if, for each plaintiff, (1) the plaintiff achieved the primary relief sought in its lawsuit; and (2) the plaintiff's lawsuit had merit and achieved its catalytic effect by threat of victory, not by dint of nuisance and threat of expense. (*Graham, supra*, 34 Cal.4th at pp. 575-576; *Skinner, supra*, 53 Cal.App.5th at p. 946.) To determine whether a particular plaintiff was successful, the court must realistically assess the impact of the litigation and determine, from a practical perspective, whether that plaintiff achieved its primary litigation objectives. (*Graham*, at p. 566.) This determination should be conducted on a case-by-case basis since the

19

various plaintiffs do not necessarily all share the same primary litigation objectives. The court should compare the specific relief sought in each action to the results obtained.[7]

If the court determines that one or more plaintiffs achieved their primary litigation objective, the court should then determine whether there was a sufficient causal connection between that lawsuit and the relief obtained. That is, were one or more of plaintiffs' lawsuits a "substantial factor" contributing to the State's decision to rescind the project approvals and decertify the EIR? If so, the court also should determine whether all the other requirements outlined above for an award of private attorney general fees have been met.

## DISPOSITION

The orders denying the fee motions are reversed, and this matter is remanded for rehearing in accordance with the views expressed in this opinion. On remand, the court is not precluded from considering new evidence, or changed circumstances that may have

---

[7]     In ascertaining the primary relief sought, the motivation for commencing a lawsuit must be distinguished from the legal right(s) sought to be enforced in the lawsuit. It may well be that a plaintiff filed a CEQA lawsuit with the goal of stopping the WaterFix project from going forward. But that was not a legal right that could be enforced under CEQA. (Pub. Resources Code, § 21168.9.) Instead, the right that could be enforced under CEQA was the right to a legally adequate EIR, e.g., an EIR that properly describes the project or that adequately analyzes the project's impacts on water quality or local communities. (Pub. Resources Code, §§ 21061, 21100; *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1446-1447.)

20

arisen during the pendency of this appeal, as it deems necessary or advisable.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

                                                       _____KRAUSE_____, J.

We concur:

_____BLEASE_____, Acting P. J.

_____DUARTE_____, J.

21

Filed 6/3/22

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DEPARTMENT OF WATER RESOURCES ENVIRONMENTAL IMPACT CASES. | C091771<br><br>JCCP No. 4942)<br><br>(Sacramento Super. Ct. Nos. 34-2017-00215965, 34-2017-80002666, 34-2017-80002667, 34-2017-80002674, 34-2017-80002676, 34-2017-80002677-CU-WM-GDS, 34-2017-80002678, 34-2017-80002680; San Joaquin Super. Ct. No. STK-CV-UWM-2017-0008624)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on May 11, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

1

BY THE COURT:


          BLEASE          , Acting P. J.




          DUARTE          , J.




          KRAUSE          , J.

2

EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Sacramento County, Kevin R. Culhane, Judge. Reversed with directions.

Somach Simmons & Dunn, Andrew M. Hitchings, Kelley M. Taber and Ellen M. Simmons for Plaintiffs and Appellants County of Sacramento, Sacramento County Water Agency, and City of Stockton.

Lisa Ann Travis and William Corbin Burke for Plaintiffs and Appellants Sacramento County, Sacramento County Water Agency and Sacramento Regional County Sanitation District.

John Luebberke for Plaintiff and Appellant City of Stockton.

Law Offices of Stephan C. Volker, Stephan C. Volker, Alexis E. Krieg, Stephanie L. Clarke and Jamey M. B. Volker for Plaintiffs and Appellants North Coast Rivers Alliance, Winnemem Wintu Tribe, Institute for Fisheries Resources, Pacific Coast Federation of Fishermen's Associations, and San Francisco Crab Boat Owners Association.

E. Robert Wright and John Buse for Plaintiffs and Appellants California Sportfishing Protection Alliance, Friends of the River, Center for Biological Diversity, Sierra Club California, California Water Impact Network, AquAlliance, Restore the Delta, Center for Food Safety, Friends of Stone Lakes National Refuge, Planning and Conservation League, and Save Our Sandhill Cranes.

Law Office of Adam Keats and Adam Keats for Plaintiff and Appellant Center for Food Safety.

Law Offices of Michael A. Brodsky and Michael A. Brodsky for Plaintiff and Appellant Save the California Delta Alliance.

Freeman Firm and Thomas H. Keeling for Plaintiffs and Appellants County of San Joaquin, Central Delta Water Agency, South Delta Water Agency, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, County of Butte, County of Plumas, and Plumas County Flood Control and Water Conservation District.

Soluri Meserve, Osha R. Meserve, Patrick M. Soluri and James C. Crowder for Plaintiffs and Appellants County of San Joaquin, Central Delta Water Agency, South Delta Water Agency, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, and Local Agencies of the North Delta.

3

The Law Offices of Roger B. Moore and Roger B. Moore for Plaintiffs and Appellants County of San Joaquin, Central Delta Water Agency, County of Contra Costa, Contra Costa County Water Agency, County of Solano, County of Yolo, County of Butte, County of Plumas, and Plumas County Flood Control and Water Conservation District.

James Mark Myles for Plaintiff and Appellant County of San Joaquin.

Nomellini, Grilli & McDaniel Law Office, Dante John Nomellini, Sr., Dante John Nomellini, Jr., and Brett Baker for Plaintiff and Appellant Central Delta Water Agency.

Law Office of John H. Herrick, John H. Herrick; Mohan, Harris, Ruiz, Wortmann, Perisho & Rubino, Mohan Harris & Ruiz and S. Dean Ruiz for Plaintiff and Appellant South Delta Water Agency.

Thomas Lawrence Geiger and Stephen Michael Siptroth for Plaintiffs and Appellants County of Contra Costa and Contra Costa County Water Agency.

Bernadette Shilts Curry and Daniel Martin Wolk for Plaintiff and Appellant Solano County.

Philip John Pogledich and Eric May for Plaintiff and Appellant County of Yolo.

Bruce S. Alpert for Plaintiff and Appellant County of Butte.

Gretchen Stuhr for Plaintiff and Appellant County of Plumas and Plumas County Flood Control and Water Conservation District.

Downey Brand, Kevin M. O'Brien, Meredith E. Nikkel, Brian E. Hamilton and Austin C. Cho for Plaintiff and Appellant North Delta Water Agency.

Rob Bonta, Attorney General, Robert W. Byrne, Assistant Attorney General, Tracy L. Winsor, Sierra S. Arballo, Colleen R. Flannery, Daniel M. Fuchs, Gwynne B. Hunter, Kelly A. Welchans, Deputy Attorneys General; Orrick, Herrington & Sutcliffe and Michael Weed for Defendant and Respondent Department of Water Resources.

Marcia L. Scully, Robert C. Horton and Bryan M. Otake for Defendant and Respondent The Metropolitan Water District of Southern California.

Best Best & Krieger, Christopher M. Pisano, Charity B. Schiller and Ryan Guiboa for Defendant and Respondent The Metropolitan Water District of Southern California, State Water Contractors and Santa Clarita Valley Water Agency.

4